IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SETH DRESSER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )   Civil No.   12-cv-253-CJP |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.**[1] | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Seth Dresser is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[2]

**Procedural History**

Plaintiff applied for benefits in May, 2008, alleging disability beginning on January 1, 2007. (Tr. 113, 116).   The application was denied initially and on reconsideration.   After holding

---

[1] Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is automatically substituted as defendant herein. No further action is necessary to continue this action by reason of the last sentence of 42 U.S.C. §405(g). ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

[2] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 20.

[1]

an evidentiary hearing, Administrative Law Judge (ALJ) Thomas C. Muldoon denied the application for benefits in a decision dated February 11, 2011. (Tr. 17-26). Plaintiff's request for review was denied by the Appeals Council, and the February 11, 2011, decision became the final agency decision. (Tr. 2).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

### Issue Raised by Plaintiff

Plaintiff contends that the ALJ erred in discounting the opinion of his treating psychiatrist, Dr. Mirza Baig.[3]

### Applicable Legal Standards

To qualify for DIB or SSI a claimant must be disabled within the meaning of the applicable statutes.[4] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

---

[3] The ALJ and the parties spell this doctor's name as "Barg." However, according to his office records, his last name is spelled "Baig." See, e.g., Tr. 367, 369. In addition, the Commissioner refers to Dr. Baig as female, but he is male. See, http://wellspringresources.co/about/leadership, accessed on February 27, 2012.

[4] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.    The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).**   Thus, this Court must determine not whether Mr. Dresser was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into

consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater**, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue**, 597 F.3d 920, 921 (7th Cir. 2010), **and cases cited therein.**

### The Decision of the ALJ

ALJ Muldoon followed the five-step analytical framework described above. He determined that Mr. Dresser had not been engaged in substantial gainful activity since the alleged onset date. He was insured for DIB through June 30, 2009, which is relevant to the application for DIB only. The ALJ found that plaintiff had severe impairments of major depression, anxiety disorder with panic-like episodes and borderline intellectual functioning. The ALJ further determined that plaintiff's impairments do not meet or equal a listed impairment.

ALJ Muldoon concluded that Mr. Dresser had the residual functional capacity to perform work at all exertional levels, limited to simple, routine activity with few social demands. In response to interrogatories, a vocational expert stated that he could perform jobs which exist in significant numbers in the national and local economy. The ALJ accepted this evidence, and found that he is not disabled. (Tr. 17-26).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff.

**1.      Agency Forms**

Plaintiff was born in March, 1986, and was 21 years old on the alleged onset date. (Tr. 143). He was 6 feet tall and weighed 150 pounds. (Tr. 146). He said that he was unable to work because of confusion, bipolar disorder, stress, anxiety and depression. He said that he had problems concentrating, remembering things, and accepting criticism and correction. (Tr. 147).

Plaintiff said that he stopped working in April 2008, because of his condition. (Tr. 147). He worked part-time as a cook in 2008. (Tr. 133). He had worked as a bagger/cashier in a grocery store and as a dishwasher in a restaurant. (Tr. 148). His earnings were always below the level of substantial gainful employment. (Tr. 127-130).

Mr. Dresser graduated from high school in 2004. He was in special education classes. (Tr. 152-153).

In a Function Report, plaintiff said that he lived with his family. He played computer games, took long bike rides for exercise, walked his dog around the neighborhood and hung out with friends. (Tr. 163). He mowed the lawn, vacuumed and cleaned his room. (Tr. 165). He was able to go shopping for personal items and clothes. (Tr. 166). He had trouble with concentrating, talking, getting along with others, understanding and following instructions. (Tr. 168).

## 2.   **Evidentiary Hearings**

Plaintiff was represented by counsel at the hearing on February 2, 2010. (Tr. 32).

Mr. Dresser testified that he had been diagnosed with bipolar disease. He was taking medication, which helped him. (Tr. 39-40). He did things over and over, like washing his hands and checking the door locks. (Tr. 43). He felt that he could work part-time, but full-time work would be overwhelming. (Tr. 45).

Plaintiff's mother testified that he was easily frustrated. (Tr. 49-50). She felt it would be hard for him to work full-time because he had "emotional outbursts." (Tr. 54). He was taking four medications for bipolar disease and depression, which helped, but she did not think he was capable of full-time work. (Tr. 55-56).

**3.      Medical Records**

Plaintiff was treated at Prairie Counseling Center from January, 2005, through June, 2006. He was referred there by "probation." He had run away from home and had a car accident in Columbia, Missouri. He left the scene of the accident and stole a Fed Ex truck, which he drove to Colorado. (Tr. 278). There was a second incident in which he took his mother's car and drove to Texas. He was arrested for stealing gas on the way home. (Tr. 274). In February, 2006, he reported that he was feeling better as he was working. (Tr. 271). The diagnosis was adjustment disorder with mixed mood. He was discharged because his family was moving and he was transferred to another provider. (Tr. 269).

In June, 2007, he was seen at Transitions Counseling after he felt rejected by a female and then spontaneously drove to Kansas City. He had episodic feelings of depression. (Tr. 294).

Mr. Dresser began treatment at Tri-County Counseling on June 26, 2007. He reported problems with depression, stress and impulsive behaviors. He had poor self-esteem and increased irritability. He was not taking any medications, but had taken Prozac in the past. (Tr. 312). On exam, he was cooperative and neatly groomed. His affect was flat. His thought processes and content were appropriate. Long term and short term memory were intact. His insight and judgment were poor. He was noted to be of average intelligence. The impression was bipolar disease. (Tr. 315-316). On February 14, 2008, it was noted that he had stopped taking his

antidepressant because it caused sexual dysfunction. (Tr. 298). In March, 2008, he reported that he had problems with impatience, anger, edginess and annoyance, but these occurred at home. He was working 21 hours a week at Sonic as a cook. (Tr. 297).

On April 18, 2008, plaintiff was admitted to Gateway Regional Medical Center with depression, paranoia and panic attacks. He had stopped taking his medications about a week and a half earlier. On the prior day, he got lost while test driving a car, and drove around for 12 hours before calling his father for directions. He was hospitalized to restart his medications and to start Lamictal. (Tr. 328-330). He was discharged on April 29, 2008. The transcript does not contain a formal discharge report. (Tr. 343)

Plaintiff's last visit to Tri-County was on May 8, 2008. He reported that his probation officer did not want him working. His mood had been "off and on," but his medications were working. (Tr. 296).

Dr. Baig first saw plaintiff on July 15, 2008. (Tr. 367). He treated him in conjunction with counseling services he received at the Community Counseling Center in Alton, Illinois. The transcript contains records of eight visits between July 15, 2008, and January 7, 2010. In November, 2010, plaintiff told Dr. Vincent he was continuing to see Dr. Baig every three months, but the transcript does not contain any records from later visits. (Tr. 551).

At the first visit, plaintiff told Dr. Baig that he was unhappy with Tri-County and therefore switched to Community Counseling. He described his legal problems, including the episode in which he left the scene of an accident and took a Fed Ex truck. On exam, he was alert and oriented. His mood was euthymic, i.e., normal. See, http://medical-dictionary.thefreedictionary.com/euthymic, accessed on February 27, 2013. His affect was appropriate.

[7]

He denied suicidal or homicidal thoughts. He was able to recall 3 out of 3 objects. His insight was poor and his judgment was extremely poor. Dr. Baig referred him for a CT scan, examination by a neurologist and IQ testing. He noted that he had a court date scheduled the next day. (Tr. 367-368).

An MRI scan of the brain was negative. (Tr. 411).

Plaintiff saw Dr. Rai, a neurologist, for evaluation. On his referral, a neuropsychological evaluation was done in September, 2008. The psychologist who did the evaluation noted several times in his report that plaintiff's effort was questionable. He also said that plaintiff confabulated responses to some questions. However, he was able to follow three-step directions and had no difficulty with attention or concentration. He displayed some problems on memory testing, but his effort was noted to be questionable. The psychologist concluded that he had some cognitive difficulties, but the extent could not be assessed because of Mr. Dresser's questionable effort. (Tr. 425-431). Dr. Rai concluded in September, 2008, that plaintiff had borderline intellectual impairment but did not identify a neurological problem. (Tr. 409, 416-417).

On September 5, 2008, Stephen G. Vincent, Ph.D., performed a consultative psychological evaluation. Dr. Vincent reviewed records from IQ testing that was done in 2001 while plaintiff was still in school. He tested in the mildly mentally retarded range at that time, but Dr. Vincent felt that those scores were not indicative of his level of functioning. He noted that Mr. Dresser had no difficulty in comprehending simple or detailed instructions and communicating effectively. Dr. Vincent noted that plaintiff was on probation for possession of marijuana, and that plaintiff told that he sometimes smoked to calm his thoughts down and relax. Mental status exam showed that he was oriented, but his mood and affect were moderately depressed. His thought processes

[8]

were adequate and not consistent with his school IQ scores in the mildly retarded ranged.   Dr. Vincent administered IQ testing in the form of the WAIS-III test, which resulted in Verbal IQ of 81, Performance IQ of 86 and Full Scale IQ of 82.   According to Dr. Vincent, he was functioning in the low average to borderline range.   His most problematic issue appeared to be mood disturbances.  (Tr. 440-443).

In September, 2008, plaintiff told Dr. Baig that he had a court date coming up.   He said he was taking his medication and was "feeling much better."   Dr. Baig noted that he had no psychotic symptoms, no hallucinations, no ideas of reference, and no suicidal or homicidal thoughts.   He concluded that he seemed to be "making fair progress."   He continued him on Cogentin, Celexa, Invega and Lamictal.   (Tr. 380).   In October, 2008, plaintiff reported that he was feeling "much, much better" with medication and he thought he would not be in legal trouble if he had been on medication before.   He was alert and oriented.   His mood was euthymic and his affect was appropriate.   He reported no major behavioral or management problems.   His memory had been fair.   (Tr. 381).

On October 29, 2008, plaintiff was very happy that he had gotten probation on his pending criminal charge.   Dr. Baig wrote that his symptoms were in "in remission with medications" and that he was "making good progress overall."   There were no positive findings on mental status exam.   (Tr. 382).

Dr. Baig saw plaintiff three more times.   On each visit, Dr. Baig noted that he was doing well on medication and his symptoms were controlled.   No positive findings were noted on mental status exams, except that, on the last visit, he reported problems with concentration and some OCD symptoms such as washing his hands frequently.   His bipolar disorder was described

as "in remission."   (Tr. 475, 476, 510).

On the date of the last visit, January 7, 2010, Dr. Baig completed a form assessing Mr. Dresser's limitations.   He indicated that Mr. Dresser had moderate limitations in activities of daily living; maintaining social functioning; concentration, persistence and pace; and episodes of deterioration or decompensation.   In answer to a question about how often plaintiff would be absent from work due to his impairment or for medical treatment, Dr. Baig checked both "three times per month" and "more than three times per month."   He attached a copy of the note from his examination that same day, in which he stated that plaintiff's bipolar disorder was in remission and that he denied any mood swings.   (Tr. 508-510).

On August 16, 2010, plaintiff presented to Gateway Regional Medical Center.   He said he wanted to be admitted because his parents did not understand him and he needed to get away from them.   He presented to the hospital at 5:49 p.m.   (Tr. 521).   He was sent home a few hours later because he did not meet the criteria for admission and there were no psychiatric beds available.   (Tr. 527-528).

Plaintiff's attorney requested that another consultative exam be done to resolve the discrepancy in plaintiff's IQ test results.   (Tr. 237-238).   The ALJ granted that request.   Dr. Vincent evaluated plaintiff again in November, 2010.   The most recent medical record available for review was the note from Dr. Baig's exam on January 7, 2010.   Dr. Vincent noted that, despite his bipolar disease being described as "in remission," plaintiff said that he had a recurrence of symptoms of depression and panic attacks.   On exam, he was oriented.   His speech was slow. His mood was depressed.   Eye contact was good.   He was concrete of thought and had difficulty with processing information.   Dr. Vincent administered the WAIS-IV on that date, which is

scored somewhat differently from the version that had been administered by him earlier.   See, http://www.pearsonassessments.com/HAIWEB /Cultures/en-us/Productdetail.htm?Pid =015-8980-808, accessed on February 27, 2013.   This test resulted in a Full Scale IQ of 71.   Dr. Vincent said that plaintiff was functioning in the borderline range of intellectual functioning.   Dr. Vincent completed a report in which he indicated that Mr. Dresser had moderate restrictions in understanding, remembering and carrying out simple instructions and in interacting appropriately with the public, supervisors and co-workers.   Moderate difficulties are defined in the form report as "more than a slight limitation in this area but the individual is still able to function satisfactorily."   Dr. Vincent also indicated that plaintiff had marked restrictions in his ability to make judgments on simple work-related decisions.   Marked difficulties are "serious" and represent "a substantial loss in the ability to effectively function."    (Tr. 548-554).

**4.      RFC Evaluation**

A state agency psychologist evaluated plaintiff's mental RFC in September, 2008, and concluded that he was not significantly limited in his ability to understand, remember and carry out short and simple instructions.   He noted that, while plaintiff had a history of learning disability and mental health issues, he was capable of performing simple, routine activities with few social demands, and that his adaptive behaviors were adequate.   (Tr. 458-460).

**Analysis**

Plaintiff argues that the ALJ erred in the weight he assigned to the opinions expressed by Dr. Baig in his report of January 7, 2010.

The Court notes that, to the extent that Dr. Baig was opining as to plaintiff's RFC, such opinions are *not* entitled to any special weight because the issue of RFC is an issue that is reserved

[11]

to the Commissioner. See, 20 C.F.R. §404.1527(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2. See also, **Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010)**.

Dr. Baig's medical opinion, as opposed to his opinion as to RFC, is, of course, not automatically entitled to controlling weight. Rather, it is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, **227 F.3d 863 (7th Cir. 2000);** *Zurawski v. Halter*, **245 F.3d 881 (7th Cir. 2001).**

With regard to the assessment of treating source opinions, the version of **20 C.F.R. §404.1527(d)(2)** in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

Here, ALJ Muldoon gave little weight to Dr. Baig's opinion because it was not well-supported by "clinical and laboratory diagnostic techniques" and it was "inconsistent with other substantial medical evidence in the case record." (Tr. 23). However, because the ALJ relied on a mistaken view of the medical evidence and only selectively considered Dr. Vincent's

[12]

second report, his assessment of Dr. Baig's opinion cannot stand.

ALJ Muldoon misunderstood the medical evidence. He said that plaintiff was hospitalized for only one day in 2008. See, Tr. 21. In fact, plaintiff was hospitalized from April 18, 2008, through April 29, 2008. See, Tr. 326, 343. He noted that a psychologist who evaluated plaintiff in 2008 said that plaintiff "yawned through some tasks and confabulated multiple responses." The ALJ concluded that this observation damaged Mr. Dresser's credibility. See, Tr. 19. The ALJ evidently did not understand that confabulation is a term of art in the practice of psychology. It means "confusion of imagination with actual memories, or the formation of false memories, due to a psychological or neurological disorder." See, http://psychcentral.com/ encyclopedia/2008/confabulation-2, accessed on February 28, 2013. Importantly, confabulation is not the conscious or deliberate telling of a falsehood; rather, the falsehood is genuinely believed by the person telling it. See, http://www.academia.edu/188810/ Faultless_ignorance_strengths_ and_limitations_of_epistemic_definitions_of_confabulation, accessed on February 28, 2013.

More importantly, ALJ Muldoon gave short shrift to Dr. Vincent's second evaluation in November, 2010. He noted only that plaintiff's IQ results were in the borderline range and that Dr. Vincent said that he had no difficulty following simple instructions. (Tr. 20, 22). The ALJ ignored the parts of Dr. Vincent's report that were favorable to plaintiff's application and which tended to support Dr. Baig's opinion. After noting that plaintiff was taking his medications, Dr. Vincent said that, despite the fact that plaintiff's bipolar disease had been described as "in remission" in January, 2010, Mr. Dresser was again having signs and symptoms of depression as well as panic attacks. (Tr. 551-552). Test results indicated that his mood was depressed with underlying anxiety. (Tr. 552). Further, Dr. Vincent opined that he had "limitations in

13

conceptual, practical and social intelligence" and that those limitations "would compromise his capacity to engage in functional activities, academics and function independently, as well as relate to others and self-direct."  (Tr. 553).   Results from the Minnesota Multiphasic Personality Inventory-II indicated "high levels of anxiety, depression, as well as problems with feeling alienated from self, as well as others, and distrust in others."  (Tr. 553).   Dr. Vincent diagnosed major depression and generalized anxiety disorder with panic-like episodes.  (Tr. 554).   Lastly, Dr. Vincent rated Mr. Dresser's ability to make judgments on simple work-related decisions as markedly limited.  (Tr. 548).   ALJ Muldoon discussed none of these findings.

     An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions."   ***Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted.**  In considering the evidence, the ALJ must "confront evidence that does not support his conclusion and explain why it was rejected.*"*   ***Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).**  ALJ Muldoon failed to build the requisite logical bridge by selectively discussing Dr. Vincent's second report, ignoring the parts that conflicted with his decision.   ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).**

     This is not to say that the ALJ was required to accept Dr. Vincent's opinion, or that acceptance of Dr. Vincent's opinion would mandate the conclusion that Mr. Dresser was disabled. However, Dr. Vincent's report tended to support Dr. Baig's opinion.   The ALJ rejected Dr. Baig's opinion because it was not supported by clinical and laboratory techniques and it was inconsistent with other medical evidence.   He could not legitimately reach that conclusion without a full consideration of Dr. Vincent's November, 2010, report.   Further, the ALJ's conclusion rested in

14

part on his view that the medical evidence showed that plaintiff improved with treatment. That conclusion ignored Dr. Vincent's observation that plaintiff was having significant symptoms despite taking his medications in November, 2010.

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Dresser is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Seth Dresser's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** March 4, 2013.

s/ Clifford J. Proud<br>
**CLIFFORD J. PROUD**<br>
**UNITED STATES MAGISTRATE JUDGE**